## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | : | CIVIL ACTION |
| JESREL MITRE, | : | |
| | : | FILE NO. 2:20-cv-12487 |
| Plaintiffs, | : | |
| | : | **FILED UNDER SEAL** |
| | : | **PURSUANT TO** |
| | : | **31 U.S.C. § 3730(b)(2)** |
| v. | : | |
| | : | DO NOT PLACE IN PRESS BOX |
| HARMAN INTERNATIONAL | : | DO NOT ENTER ON PACER |
| INDUSTRIES, INCORPORATED, | : | |
| | : | JURY TRIAL DEMANDED |
| Defendant. | : | |

## <u>COMPLAINT</u>

Plaintiff Jesrel Mitre ("Relator") brings this action to recover damages and

civil monetary penalties on behalf of the United States of America arising from

violations of the Civil False Claims Act, 31 U.S.C. § 3729 *et seq*., by Defendant

Harman International Industries, Incorporated ("Harman" or "the Defendant").

## SUMMARY OF THE FALSE CLAIMS

1.      For more than two years, Harman made false statements on customs forms relating to the importation of heat sinks (a type of aluminum extrusion) from the People's Republic of China ("China").[1]

2.      On May 26, 2011, the Department of Commerce ("Commerce") issued an antidumping duty order and a countervailing duty order on a broad range of aluminum extrusions from China.  These orders, and subsequent scope rulings by Commerce, excluded some finished heat sinks from the scope of the orders where "*the design and production... are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements*." (Emphasis added).

3.      Between December 2015 and July 2018, Harman imported approximately 125 shipments of heat sinks into the United States from China which did not meet the finished heat sink exception carved out in Commerce's orders.  On each customs form related to these shipments, Harman made statements falsely claiming that the heat sinks were excluded from the scope of the order.

---

[1] Heat sinks transfer the heat generated by electronic devices to a fluid medium, often air or a liquid coolant, where it is dissipated away from the device, thereby allowing regulation of the device's temperature.

4.    As a result of the false statements, Harman evaded significant antidumping and countervailing duties for years and gained an unfair advantage over competitors who paid the requisite antidumping and countervailing duties.

## JURISDICTION AND VENUE

5.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the federal False Claims Act, 31 U.S.C. §§ 3729-3733 and 31 U.S.C. § 3732(a), which expressly confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

6.    This action is not subject to 31 U.S.C. § 3730(b)(5)'s first-to-file restriction because the false claims allegations in this Complaint are not based on the facts underlying a pending FCA action.  Likewise, this action is not subject to 31 U.S.C. § 3730(e)(4)(A)'s public disclosure limitations because the allegations and transaction in this action have not been publicly disclosed in a federal criminal, civil, or administrative hearing in which the government or its agent is a party, in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation, or in the news media.  Moreover, if there has been a prior public disclosure of any of the allegations or transactions alleged in this action through one of the above-referenced categories of proceedings or sources, Relator qualifies as an "original source" pursuant to 31 U.S.C. § 3730(e)(4)(B).

7.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." Section 3732(a) also authorizes nationwide service of process. At all times relevant to this action, up to and including the date of this filing, the Defendant has resided in, transacted business in, and committed FCA violations in the Eastern District of Michigan.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) because the Defendant resides in the Eastern District of Michigan in that it has contacts in the district that would be sufficient to subject it to personal jurisdiction if the district were a separate state. At all times relevant to this action, the Defendant has regularly conducted substantial business within the Eastern District of Michigan, maintained employees in the district, and made significant sales within the district. Venue is also proper in this Court pursuant to 31 U.S.C. § 3732(a) because the Defendant can be found, resides, and has committed numerous FCA violations in the Eastern District of Michigan.

## THE PARTIES

9.     Harman is a Delaware corporation with its principal office located at 400 Atlantic Street, 15th floor, Stamford, Connecticut 06901. Harman is an

4

independent subsidiary of Samsung Electronics and manufactures audio, electronic, and infotainment systems for computers, automobiles, and homes. Harman is licensed to conduct business in the State of Michigan and can be served with process through its registered agent located at The Corporation Company, 40600 Ann Arbor Road, East Street, 201, Plymouth, Michigan 48170.

10.     Harman sells its products to retailers throughout the United States, including in the Eastern District of Michigan.  Harman also maintains a large office with numerous employees in Novi, Michigan, which is located in the Eastern District of Michigan.  In 2016, Harman's revenue was $6.90 billion.

11.     Relator Jesrel Mitre ("Relator") is a United States citizen and resident of the State of Texas.

12.     Relator is a U.S. Customs Compliance & Logistics Cost Specialist for Harman.  In this role, Relator is responsible for all functions of customs compliance, including determining whether any imports into the United States are subject to antidumping and countervailing duties.  Relator obtained his customs broker license in 2019.

13.     Between 2006 and 2014, Relator was employed by a company called AMX.  In 2014, Harman purchased AMX, and Relator subsequently became an employee of Harman.  In 2018, Relator began working on Harman's importation of heat sinks.  It was in this capacity that Relator learned that Harman had not been

paying the requisite antidumping and countervailing duties on the importation of heat sinks.

14.     Relator has direct and independent knowledge of the Defendant's fraudulent conduct as it relates to the avoidance of antidumping and countervailing duties on aluminum extrusions from China.  He acquired this first-hand knowledge of the Defendant's fraudulent conduct during his employment with the Defendant.

15.     Relator brings this action under the qui tam provision of the federal False Claims Act.  Relator shared all information with the United States prior to filing suit under seal.  Relator complied with all statutory requirements placed on qui tam relators.

## LEGAL AUTHORITY

### THE FALSE CLAIMS ACT
### (31 U.S.C. §§ 3729-3733)

16.     Relator has brought this action under the FCA on behalf of the United States to recover damages and civil monetary penalties from the Defendant for the fraudulent conduct detailed herein.  The FCA provides that any person who knowingly uses, or causes to be used, a false record or statement material to an obligation to pay or transmit money to the United States is liable for (a) three times the amount of the damages sustained by the Government and (b) a civil penalty ranging from $11,665 to $23,331 for each such claim. *See*, 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

## FACTUAL ALLEGATIONS

<u>CUSTOMS LAWS AND FORMS</u>

17.     The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

18.     The United States of America ("United States" or "U.S."), through the Bureau of Customs and Border Protection ("CBP"), a division of the U.S. Department of Homeland Security, collects duties and penalties on the importation of goods into the United States pursuant to the Tariff Act of 1930, 19 U.S.C. § 1202, *et seq*.

19.     The U.S. International Trade Commission (hereafter referred to as the "USITC") and the U.S. Department of Commerce (hereafter referred to as "Commerce") are responsible for conducting antidumping and countervailing duty investigations.

20.     The Tariff Act of 1930 allows for industries in the United States to petition the USITC and the Department of Commerce for relief from imported goods sold in the United States at less than fair value (a practice known as "dumping") or that benefit from countervailing subsidies provided by foreign governments.

21.     If it is determined that dumping is occurring and that an industry in the United States is being materially injured or threatened by the dumping,

Commerce may issue an antidumping duty or countervailing duty order to offset the dumping.

22.     The Harmonized Tariff Schedule of the United States (hereafter referred to as "the HTS") is the principal resource used for determining tariff classifications for imported goods into the United States. The HTS is published and maintained by the USITC.

23.     There are over 17,000 unique ten‑digit HTS classification codes. Each unique code informs the Bureau of Customs and Border Protection of the correct duty or penalty for any given imported good.

24.     The Bureau of Customs and Border Protection ("CBP") is solely authorized to interpret the HTS, issue legally binding rulings or advice on tariff classifications, administer customs laws, and collect all duties and penalties on behalf of the United States.

25.     When a company in the United States imports goods from a foreign country, it must submit a Form 7501 to CBP. This form is generally sent electronically.

26.     Among other things, a completed Form 7501 details the importer of record, country of origin, U.S. port of lading, the consignee, a description of the merchandise, quantity of units, and the total value of the goods.

27.     Under the description of the merchandise, the importer is required to fill in a box labeled "HTSUS" which is where the importer enters the HTS classification code. The importer is also required to provide a description of the goods on other entry documentation.

28.     If the incorrect HTS classification code is entered on the Form 7501, or if a false description is used on entry documentation and submitted to CBP, the importing party may evade the required duty or penalty on the goods being imported and escape detection.

29.     A Form 7501 also has a box labeled "Entry Type."  If the importer of record enters "*01*" in this box, the importer is classifying the import as "*Free and Dutiable*."  If the importer enters "*03*" in this box, the importer is classifying the import as "*Antidumping/Countervailing Duty (AD/CVD)*."  If the wrong number is entered, the importing party may evade the required duty or penalty on the goods being imported.

30.     It is the responsibility of the importer of record to use "reasonable care" to "enter," "classify," and "value" the goods and to provide any other information necessary to enable CBP to assess the correct duties, collect accurate statistics, and determine whether all other applicable requirements are met. 19 U.S.C. § 1484.

31.     19 U.S.C. § 1485(a)(3) provides that the importer is required to declare under oath that, among other things, "*all statements in the invoice or other documents filed with the entry, or in the entry itself, are true and correct*."

32.     19 U.S.C. § 1592(c) establishes civil penalties for introducing goods into the United States by means of any material and false statement. The severity of the penalty depends on whether the violation was committed with fraud, gross negligence, or negligence. For instance, a fraudulent violation is punishable by a civil penalty in an amount not to exceed the lesser of the domestic value of the merchandise or four times the lawful duties, taxes, and fees.

33.     19 U.S.C. § 1592(d) further provides: " ... *if the United States has been deprived of lawful duties, taxes, or fees as a result of a violation of subsection (a) of this section, the Customs Service shall require that such lawful duties, taxes, and fees be restored, whether or not a monetary penalty is assessed*."

34.     Falsely classifying goods on entry documentation is also a crime. 18 U.S.C. § 542 provides that whoever "*introduces ... into the commerce of the United States any imported merchandise ... by means of any false statement in any declaration without reasonable cause to believe the truth of such statement ... [s]hall be fined for each offense under this title or imprisoned not more than two years, or both*." 18 U.S.C. § 541 also provides: "*Whoever knowingly effects any entry of goods, wares, or merchandise, at less than the true weight or measure*

*thereof, or upon a false classification as to quality or value, or by the payment of less than the amount of duty legally due, shall be fined under this title or imprisoned not more than two years, or both.*"

35.     An individual who falsifies a Form 7501 may also be guilty of wire fraud under 18 U.S.C. § 1343 which carries a possible sentence of twenty years. An individual who knowingly makes a false classification may also be guilty of making a false statement under 18 U.S.C. § 1001 which carries up to five years in prison.

36.     False statements or records made to avoid or decrease the obligation to pay antidumping duties on imported goods are also actionable under the False Claims Act's reverse false claims provision pursuant to 31 U.S.C. § 3729(a)(1)(G).

## COMMERCE'S ALUMINUM EXTRUSION ORDERS

37.     On May 26, 2011, the U.S. Department of Commerce published in the Federal Register (76 FR 30650; 76 FR 30653) an antidumping duty order and a countervailing duty order on a broad range of aluminum extrusions from China ("Commerce's orders").

38.     While some Chinese manufacturers had different rates, most manufacturers were placed under a general category referred to as the "PRC-Wide"

rate.  In 2011, the PRC-Wide rate for antidumping duties was 33.28%[2] and the

PRC-Wide rate for countervailing duties was 7.37%.[3]  By late 2016, Commerce

increased the PRC-Wide rate for antidumping duties to 85.94%. In late 2017, the

rate increased slightly to 85.96%.

39.     Commerce's orders state that the following merchandise is within the

scope of the orders:

> *The merchandise covered by this order is aluminum extrusions*
>
> *which are shapes and forms, produced by an extrusion process,*
>
> *made from aluminum alloys having metallic elements*
>
> *corresponding to the alloy series designations published by The*
>
> *Aluminum Association commencing with the numbers 1, 3, and*
>
> *6 (or proprietary equivalents or other certifying body*
>
> *equivalents).[4]*

---

[2] The margin adjusted for liquidation and cash deposit purposes was determined to be 33.18%. *See*, 79 FR 78784.

[3] Commerce originally imposed a countervailing duty of 374.15%, but the rate was eventually reduced to 7.37%.  *See*, MacLean-Fogg Co. v. United States, Case No. 1:11-cv-00209, Doc. 125-1 (Ct. Int'l Trade 2015).

[4] Commerce's orders explain the alloy series designations:

"*Specifically, the subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing with the number 1 contains not less than 99 percent aluminum by weight. The subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing*

40.     The orders go on to state: "*Subject extrusions may be identified with reference to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or <u>heat sinks (that do not meet the finished heat sink exclusionary language below)</u>.*" (Emphasis added).

41.     The orders explain that *some* heat sinks are excluded from the scope of the orders:

> *Also excluded from the scope of this order are <u>finished heat sinks</u>. Finished heat sinks are fabricated heat sinks made from aluminum extrusions the design and production of which are organized around <u>meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested</u> to comply with such requirements.*

---

*with the number 3 contains manganese as the major alloying element, with manganese accounting for not more than 3.0 percent of total materials by weight. The subject merchandise is made from an aluminum alloy with an Aluminum Association series designation commencing with the number 6 contains magnesium and silicon as the major alloying elements, with magnesium accounting for at least 0.1 percent but not more than 2.0 percent of total materials by weight, and silicon accounting for at least 0.1 percent but not more than 3.0 percent of total materials by weight. The subject aluminum extrusions are properly identified by a four-digit alloy series without either a decimal point or leading letter.*"

42.     Commerce's May 26, 2011 orders direct importers to use various HTS codes depending on the type of aluminum extrusion; however, the orders make clear: "*While HTS subheadings are provided for convenience and customs purposes, <u>the written description of the scope of the order is dispositive</u>.*" (Emphasis added).[5]

43.     In other words, the HTS code used by an importer is not dispositive as to whether antidumping and countervailing duties are owed on a shipment of merchandise.  Instead, the importer must look to the language of Commerce's orders and then correctly enter "*01*" (for duty-free) or "*03*" (for antidumping and countervailing duties) in the "*Entry Type*" box on the Form 7501.

44.     On December 15, 2017, Commerce issued a redetermination in the case of <u>Agilent Technologies v. United States</u>, Case No. 16-00183, Doc. 40-1 (CIT 2017), in which it further clarified the finished heat sink exclusion.  In its redetermination, Commerce stated that all of the following elements must be satisfied for a product to be excluded under the finished heat sink exception:

> *(1) the product must be a "fabricated heat sink... made from aluminum extrusions"; (2) specified thermal performance*

---

[5] Commerce's order provides the following HTS codes: 7604.21.0000, 7604.29.1000, 7604.29.3010, 7604.29.3050, 7604.29.5030, 7604.29.5060, 7608.20.0030, and 7608.20.0090.

> requirements must exist; (3) the product's design must have
> been organized around meeting those specified thermal
> performance requirements; (4) the product's production must
> be organized around meeting the specified thermal
> performance requirements; and (5) the product must have been
> fully, albeit not necessarily individually, tested to comply with
> the specified thermal performance requirements.

45.     The redetermination by Commerce in the <u>Agilent</u> case makes clear that it construes the "*finished heat sink*" exclusion very narrowly.

THE FRAUDULENT SCHEME

Overview

46.     The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

47.     Harman has been importing heat sinks from China since at least December 2015 from a variety of Chinese manufacturers, including Qingdao Tai-Kyung Electronic Co. ("Qingdao Tai-Kyung Electronic").

48.     Since Commerce's orders were issued on May 26, 2011, Qingdao Tai-Kyung Electronic has been subject to the antidumping and countervailing PRC-Wide Rate for aluminum extrusions.

49.    Between December 15, 2015 and August 6, 2018, Harman imported into the United States approximately 125 shipments of heat sinks that had been manufactured by Qingdao Tai-Kyung Electronic ("Harman heat sinks").

50.    Each Harman heat sink in these 125 shipments was subject to Commerce's May 26, 2011 orders, because the heat sinks in these shipments did not satisfy Commerce's finished heat sink exclusion.

51.    For each shipment of the Harman heat sinks into the United States, Harman knowingly submitted or caused to be submitted a false Form 7501 and other entry documentation indicating that the imported merchandise was not subject to Commerce's orders.  By doing so, Harman was able to avoid antidumping and countervailing duties which it had an obligation to pay at the time the Harman heat sinks were brought into the country.

52.    After importing the Harman heat sinks, Harman would assemble the heat sinks into finished electronic products.  Harman would then sell these finished electronic products to retailers across the country, including in the Eastern District of Michigan.  By failing to pay the requisite duties, Harman was able to maximize its profits from the sale of these finalized electronic products to the detriment of law-abiding companies that produced similar products.

<u>The Emails</u>

53.    In June 2018, Relator became aware that Harman had made false statements on customs forms with regard to the Harman heat sinks.  As a result, Relator began an investigation into the matter to determine how widespread the problem was.

54.    Specifically, on June 11, 2018, Relator sent an email to Harman engineers asking if a shipment of heat sinks with Harman part number 704-50190 was subject to Commerce's orders.  Relator eventually learned that the part did not undergo testing and was therefore subject to Commerce's orders.

55.    On June 13, 2018, Relator sent an email to his supervisor, Matyas Opra-Szabo ("Opra-Szabo").  Opra-Szabo is the Senior Director, Global Logistics & Trade Compliance at Harman.  The email informed Opra-Szabo that Harman part number 704-50190 was subject to Commerce's orders.

56.    On June 19, 2018, Relator sent an email with a questionnaire to engineers at Harman concerning "*Heat Sink 2351781*."[6]  On June 21, 2018, engineer Jing Tao responded confirming that: 1) the part is "*an extrusion part*"; 2) that it is a fabricated heat sink made of aluminum and manufactured by extrusion process; 3) that the supplier is Qingdao Taikyung Electronic Co., LTD; 4) that thermal performance is not required; 5) that the design was not organized around

---

[6] This refers to Harman part number 2351781.

meeting specific thermal performance requirements; 6) and that the heat sinks were not tested to comply with thermal performance requirements.

57. Based on the engineer's responses, these imported heat sinks were clearly subject to Commerce's orders, but Harman never paid the requisite duties for the heat sinks.

58. After continuing his investigation, Relator sent an email to Opra-Szabo on July 11, 2018 informing him that Harman had imported five different heat sinks without classifying those shipments as being subject to Commerce's orders. Relator wrote: "*At this point, in order to fulfill our importer due diligence, we will need to file a prior disclosure. So far I've calculated a total of $91,284.02 as shown below....*" [7]

59. On July 17, 2018, Relator sent an email to Anthony Agrusa ("Agrusa"), a trade specialist with Sandler & Travis Trade Advisory Services, Inc. ("STTAS"). STTAS is a company hired by Harman as a trade advisor to assist with the classifications of merchandise imported into the country. The email detailed that Relator had identified several aluminum heat sinks that were subject

---

[7] "A valid prior disclosure discloses the circumstances of a violation of 19 U.S.C. § 1592 to CBP before, or without knowledge of, the commencement of a formal investigation of that violation by CBP, and includes a tender of any actual loss of duties associated with the violation." *See*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/Prior%20Disclosure%20FINAL.pdf; 19 U.S.C. § 1592(c)(4).

to Commerce's orders but were identified as normal entries on customs forms.  In the email, Relator requests Agrusa's assistance in supporting an audit and preparing a report to determine the unpaid antidumping and countervailing duties for the heat sinks.  Copied on the email was Opra-Szabo.

60.     Later in the day, Relator sent another email to Agrusa asking him to perform a number of tasks, including "*[c]alculate the amount of AD/CV back-duties owed, plus interest*" and "*[p]rovide resources for writing up a prior disclosure for customs*."  Again, Opra-Szabo was copied on the email.

61.     On July 18, 2018, Opra-Szabo sent electronic messages to Relator discussing how to move forward with the disclosure of the unpaid duties: "*want to make sure we send a prealert to Henry and Bronson before filing disclosure*" and "*let me know when you have all related info together; we'll set up a call and agree on the story line*."  "Henry" and "Bronson" are employees of Harman who work in the finance department.

62.     Between July and August of 2018, Relator exchanged a series of emails with Agrusa regarding the different part numbers subject to Commerce's orders and the amount of duties owed by Harman.

63.     Based on these discussions with Agrusa, on July 18, 2018, Relator sent an email with an attached questionnaire to Harman engineers.  The

questionnaire contained a list of part numbers and questions to ascertain if those parts were subject to Commerce's orders.

64.     When one engineer noted that she was on vacation, Opra-Szabo responded: "*there is no particular deadline but we are rather <u>sitting on a ticking time bomb</u>. Therefore want to file a prior disclosure asap, and these are the only items where we need more information to be able to decide if the duty was underpaid.*" (Emphasis added).

65.     On July 25, 2018, engineer Jing Tao responded to Relator's questionnaire showing that some of the part numbers were subject to Commerce's orders.[8]

66.     On August 13, 2018, Agrusa emailed a report to Relator and Opra-Szabo showing that Harman owed $1,033,494.28 in duties and interest for the Harman heat sinks.

67.     On August 21, 2018, Opra-Szabo sent an email to Agrusa asking "*do we have a backup for the calculation.*" Opra-Szabo also inquired of Relator: "*I want to give a headsup to finance before we start working with the law firm on this.*"

---

[8] Relator determined that a number of Harman part numbers manufactured in China were heat sinks subject to Commerce's orders including the following: 1739735, 1739867, 1932470, 1932489, 2351781, 2574055, 299368001, 301141001, 301411001, 302821001, 305520001, and 704-50190.

68.     That same day Agrusa responded to Opra-Szabo, explaining: "*The calculation used was the AD/CVD duty rate that was active at the time of entry multiplied against the line item entered value of the good. The rates were pulled from the announcements that were published on CBP's AD/CVD website.  The interest rate was then applied to the amount of duty that was determined.*"

69.     In December 2018, Opra-Szabo instructed Relator to prepare a prior disclosure to send to CBP.  On December 17, 2018, Relator emailed a proposed prior disclosure to Opra-Szabo.

70.     Despite knowing that Harman owed more than $1,000,000 in duties and interest for the Harman heat sinks, Harman took no action on the matter in 2018 or 2019.

71.     In March of 2020, Opra-Szabo asked Relator about the Harman heat sinks.  In response, Relator emailed Agrusa's 2018 report to Opra-Szabo.  On March 19, 2020, Opra-Szabo replied: "*this is ancient history now; what's next steps now?  I believe the process was fixed back in 2018 so numbers did not change much.  Can you pls dust it off and suggest next steps?  Would you to lead this project?*"

72.     On the same day, Relator emailed Opra-Szabo suggesting that Agrusa recalculate the interest accumulation and that Opra-Szabo find a trade attorney to use for the disclosure to CBP.  Opra-Szabo responded: "*makes sense; expecting*

*you drive this to closure, right?*" Relator responded that he could and that he would have Agrusa recalculate the amount owed as soon as possible.  Relator then sent an email to Agrusa asking him to recalculate the interest.

73.    On April 14, 2020, Agrusa reported to Relator that the updated amount owed to CBP was $1,349,449.46.  Relator reported this updated figure to Opra-Szabo via email on the same day.

74.    As a major manufacturer and wholesaler of electronic devices containing aluminum extrusions from China, Harman knew that the Harman heat sinks were subject to antidumping and countervailing duties and that it was not paying the requisite duties on the Harman heat sinks.

75.    Even today, despite knowing that it owes CBP more than $1.3 million in duties and interest on the Harman heat sinks, Harman has taken no actions to alert CBP and pay the requisite duties for the Harman heat sinks.

<u>Specific Examples of Fraud</u>

76.    The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

77.    For most of the 125 shipments into the United States, Harman described the Harman heat sinks on the Form 7501s as "*MICROPHONES ETC, PARTS, OT*" and provided an HTS code of 8518.90.8000 or 8518.90.8100.  While

this description is partially accurate, Harman failed to disclose on the Form 7501s

that these shipments contained heat sinks subject to Commerce's orders.

78.     Specifically, in box 2 of each Form 7501, Harman marked the "*Entry*

*Type*" as "*01*" thereby misidentifying the shipments as not being subject to

antidumping and countervailing duties.

79.     The following table contains ten of the 125 shipments of Harman heat

sinks that were imported by Harman into the United States.  For each shipment,

Harman falsely stated on the Form 7501 that the entry type was duty‑free.

| Date of Entry | Entry No. | Harman Part No. | Value | Duty Rate AD/CV (%) | Duties Owed |
|---|---|---|---|---|---|
| 12/28/15 | 91628671678 | 305520001 1932470 | $6,552.56 | 33.18/7.37 | $2,657.06 |
| 01/22/16 | 91628785064 | 1932470 2351781 1739735 1932489 | $28,827.99 | 33.18/7.37 | $11,689.75 |
| 06/14/16 | 91630766961 | 1932470 | $14,676.37 | 33.18/7.37 | $5,951.26 |
| 12/23/16 | 91631907002 | 1932489 1932470 305520001 2351781 | $18,631.25 | 85.94/7.37 | $17,384.82 |
| 04/01/17 | 91632648985 | 1932489 1932470 2351781 | $17,347.54 | 85.94/7.37 | $16,186.99 |
| 07/05/17 | 91633970495 | 305520001 1932470 1932489 1739867 | $12,168.73 | 85.94/7.37 | $11,354.64 |
| 10/11/17 | 91634312440 | 1739867 1932489 | $25,105.48 | 85.94/7.37 | $23,425.92 |

| | | 305520001 1932470 | | | |
|---|---|---|---|---|---|
| 02/02/18 | 91635222325 | 1932470 305520001 2351781 | $10,448.58 | 85.96/7.37 | $9,751.66 |
| 05/03/18 | 91636021114 | 305520001 1739867 1932489 2351781 1932470 | $17,356.67 | 85.96/7.37 | $16,198.99 |
| 06/26/18 | 91636548561 | 1932470 305520001 2351781 1739867 1739735 1932489 | $21,413.87 | 85.96/7.37 | $19,985.57 |

80.     For each of these shipments, Harman knew that it was required to pay the requite antidumping and countervailing duties, but it failed to do so. Instead, Harman intentionally and knowingly misidentified the shipments as not being subject to Commerce's order, thereby evading the duties altogether.

**COUNT I:**
**VIOLATION OF THE CIVIL FALSE CLAIMS ACT**
**(31 U.S.C. § 3729(a)(1)(G))**

81.     The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

82.     Harman imported thousands of the Harman heat sinks into the United States between December 2015 and July 2018.

83.     Harman had an obligation to pay the antidumping and countervailing duties to the United States on each Harman heat sink that it imported.

84.     Harman avoided its obligation to pay the antidumping and countervailing duties that it imported by making or causing to be made a material false record or statement to CBP.

85.     Harman knowingly and improperly made the material false record or statement as Harman had actual knowledge of the false information, acted in deliberate ignorance of the truth or falsity of the information, or acted in reckless disregard for the truth or falsity of the information.

86.     Specifically, on the Form 7501 and other entry documentation for shipments of the Harman heat sinks, Harman knowingly and improperly entered the merchandise as not being subject to any antidumping and countervailing duties when it knew that the Harman heat sinks were in fact subject to antidumping and countervailing duties.

87.    Harman made the false statements for the purpose of importing the goods into the United States duty-free.

88.    As a consequence, Harman, with knowledge, falsely represented to CBP that no duties or penalties should be assessed on the importation of the Harman heat sinks and successfully avoided having to pay the requisite duties.

89.    Harman's course of conduct therefore violated the False Claims Act, 31 U.S.C. § 3729, *et seq*.

## PRAYER FOR RELIEF

Relator, on behalf of himself and the United States, respectfully requests a trial by jury on all issues and that this Court award the following damages and all further relief as this Court deems equitable and just to the parties and against Harman:

To the United States:

(A)    Three times the amount of actual damages which the United States has sustained as a result of Harman's conduct;

(B)    A civil penalty of not less than $11,665, and as much as $23,331, for each violation of 31 U.S.C. § 3729(a)(1)(G) (and/or the preceding version of such statutory section);

(C)    Prejudgment interest; and

(D)    All costs incurred in bringing this action.

26

To Relator:

    (A)    The maximum amount allowed pursuant to 31 U.S.C. §

            3730(d) and/or any other applicable provision of law;

    (B)    Reimbursement for reasonable expenses which Relator

            incurred in connection with this action; and

    (C)    An award of reasonable attorneys' fees and costs.

This 10th day of September, 2020.

                          PATE, JOHNSON & CHURCH, LLC

                          <u>/s/ Page A. Pate</u>
                          Page A. Pate
                          Georgia Bar No.: 565899
                          Pate, Johnson & Church, LLC
                          101 Marietta Street, Suite 3300
                          Atlanta, Georgia 30303
                          (404) 223-3310
                          Attorney for Plaintiff/Relator